(124 So. 302)

**RICHARDSON v. GRAMLING.** (7 Div. 883.)

Supreme Court of Alabama. Oct. 24, 1929.

Alto V. Lee, of Gadsden, for appellant.

Goodhue & Lusk, of Gadsden, for appellee.

BROWN, J. The case was tried on count 4 of the complaint, added by amendment, after demurrer was sustained to the several counts of the original complaint. Said count 4 declares on a promissory note for $1,200 made by the appellee to the appellant on the 17th day of November, 1927, and payable on the 17th day of November, 1929, with interest thereon, stipulating that the principal was payable in monthly installments of $50 each, "commencing on December 6th, 1927, and failure to pay any installment note when due, makes all installments due and payable"; and averring that three of the installment notes due, respectively, March 6, April 6, and May 6, 1928, were due and unpaid.

The plea was the general issue, pleaded in short by consent with leave to offer evidence sustaining any special defenses as if specially pleaded. The defendant had the affirmative charge directing a verdict in her favor, and now insists, (1) that the evidence, without dispute, shows that the debt represented by the note was the debt of C. H. Gramling, the husband, and that the defendant is a mere surety thereon; and (2) that the note is without consideration to support it, and it is therefore a nudum pactum, and void.

The evidence was without dispute that the note was executed by the defendant, and that she had failed to pay the installments maturing in March, April, and May, 1928. This made a prima facie case for the plaintiff, and under the statute the burden goes to the defendant to impeach the note by showing a special defense that would preclude a recovery. Code 1923, § 7662.

Evidence developed on cross-examination of the plaintiff, and adduced by the defendant, shows: That prior to the execution of the notes C. H. Gramling, the husband of the defendant, had been engaged in the insurance business, and that plaintiff worked for him as his assistant or secretary in the conduct of his business. That Gramling, his wife, Gladys L. Gramling, and the plaintiff incorporated the C. H. Gramling Company, Inc., with a capital stock of $2,600, which took over Gramling's insurance business, the defendant subscribing to 12 shares of the stock of the par value of $1,200, C. H. Gramling 1 share of the par value of $100, and the plaintiff 13 shares of the par value of $1,300; Mrs. Gramling, the defendant, being named as president of the corporation, C. H. Gramling the manager, and plaintiff the secretary and treasurer, the three being named as the board of directors. The certificates of stock in the corporation were issued in accordance with the subscription signed by the defendant as president, and the plaintiff as its secretary and treasurer. That although certificate of incorporation shows that all of the capital stock subscribed was paid in cash, in fact the only money actually paid in was the $1,300 paid by the plaintiff.

The consideration for the execution of the note sued on was the purchase price of the plaintiff's stock in the corporation, which was transferred on the books of the corporation to the defendant, one share of which was subsequently transferred by her to Lorene Gray, after plaintiff's withdrawal from the corporation.

The note sued on was executed by the defendant only, but contemporaneously with the execution of this note installment notes were executed for the monthly payments, signed first by the defendant and then by her husband, and the 13 shares of stock, as recited in the major note were attached to and pledged as collateral security for the payment of the indebtedness.

The plaintiff testified on cross-examination: "I worked for Mr. Gramling in the insurance business. I worked for him prior to the time the incorporation was perfected, or rather at the time. We incorporated on the 6th of November, and that is when I came into the business. I talked with Mr. Gramling about going into the business. I did not have a conversation with Mrs. Gramling. At the time I talked to Mr. Gramling, I asked him if at the end of a year I was not satisfied, would the company pay me back the money I had put in it, and he said yes. * * * I went into the company, and before the expiration of the year, or about the expiration of twelve months, I told Mr. Gramling that I was not satisfied. There wasn't anything took place between me and Mr. Gramling at that time with reference to buying me out, or refunding my money. I did not have a conversation with Mr. Gramling until the night of the stockholders' meeting, when we were going to have the stockholders' meeting. I first told him that I wanted to get back the money that I had put in the business the night that the stockholders' meeting was to have been, which was the 9th of November, 1927. We did not have that meeting. I had the next conversation with Mr. Gramling the next morning in the office. He told me he was ready to buy me back and that he would give me fifty dollars a month payments. No, I did not say to him that the stock was not worth anything. At the time that he said that, the C. H. Gramling Insurance Company was not in any good condition at all. It was insolvent. The company owed a great deal more than it could pay and a good deal more than it had assets to show for. It owed that before I went in there, but I didn't know it. After I went in the business I stayed in there with him and kept up with the business the best I could. I drew a

salary out of it, and stayed in there a year when I became dissatisfied and wanted to get my money back. Finally Mr. Gramling said he would buy me out if I would take monthly notes, and I refused to take his notes. I don't think I had consulted with an attorney at that time. I don't think I had consulted with an attorney about it prior to the time that the stockholders' meeting was to have been held. It was after that time. I told Mr. Gramling I would not take his notes, that he would have to give me additional security. I believe it was first suggested that Mr. Gramling give security for it on the same day that the notes were made out. I had already agreed with Mr. Gramling as to the price he was to pay, which was $1300. I had put in Thirteen Hundred Dollars, and he paid me One Hundred Dollars cash, and gave me a note for Twelve Hundred Dollars. He gave me the Hundred Dollars at the time the notes were made out. Up to that time I never had had a conversation with Mrs. Gramling about it. At the time the notes were executed, Mr. Gramling and I were up in Mr. Lee's office, and Mr. Lee or I—one told Mr. Gramling that his note would not be sufficient, and that he would have to get his wife to sign it, and the notes were fixed up in Mr. Lee's office, and Mr. Gramling carried the notes off with him, and after a while he came back with the notes signed up by Mrs. Gramling, and I took the notes and carried them to the First National Bank and left them there for collection. I did not try to discount them at the bank."

On redirect examination, however, she testified:

"I refused to take Mr. Gramling's note because I didn't think he had anything to take care of the note with. I refused to sell the stock to him. He said he would make arrangements to get somebody to take it over. That was the night of the meeting. When I said on cross-examination that he would have to give security for it, I meant to say that he would have to get somebody to purchase that stock. I did not at any time agree to sell to Mr. Gramling at all, whether he got security or did not get security. He told me that he would get somebody to purchase that stock.

"Mr. Gramling informed me whom he had gotten to purchase the stock. He told me he had gotten his wife to purchase the stock. His wife was connected with the Gramling Insurance Company. I don't know what her position was. Mrs. Gramling owned Twelve Hundred Dollars worth of stock. Mr. Gramling was the manager of the business, and he owned a hundred dollars of stock. I put thirteen hundred dollars into the purchase of the stock. I bought the stock from Mr. C. H. Gramling. He was in the insurance business at that time. At the time I bought the stock, when he asked me to go in business with him, he told me his business was in a flourishing condition. He offered to pay me sixty dollars a month. He said my salary and commissions would amount to somewhere between a hundred and a hundred and forty dollars a month. I don't know what went with the money that I put into the business that I purchased the stock with. I don't now whether Mrs. Gramling put Twelve Hundred Dollars into the Company or not. I don't know whether Mr. Gramling put in a hundred dollars or not. I did not have but very little to do with the management of the business. Mr. Gramling handled the cash. He purchased Mr. Gramling's old insurance business. I don't know whether or not that thirteen hundred Dollars went to pay the indebtedness of Mr. Gramling, as an individual, in the insurance business or not. From the very beginning the company was indebted to the insurance companies it was representing. They were never able to pay those insurance companies. I was present when Mr. Gramling brought the note signed by his wife. I transferred my stock to Mrs. Gramling when he gave me the note for Twelve Hundred Dollars. He gave me a hundred dollars in cash, forty dollars cash and an insurance policy."

The substance of the defendant's testimony was that all that she knew about the C. H. Gramling Company was that she was the third party in it; that she had no money to put in it and put no money in it; that she knew nothing about the agreement with the plaintiff, and did not on behalf of the company enter into an agreement to buy back the plaintiff's stock, and did not know anything about it; that at the time she signed the notes her husband came home and told her he was ruined if she did not sign them, that his insurance business would be gone, and that was the way he had to make a living, and then she signed the notes, and that nothing was said about stock in this transaction; that she filled out the stock and signed it when it was issued, but that she did not write the transfer; that she did not authorize Gramling to purchase the stock, that she knew nothing about it, and did not even read the note; that she did not purchase the stock from the plaintiff, nor did she pay her anything for it, and had no idea what she was giving the note for and made no inquiry about it; that she did not give Lorene Gray a share of the stock, but a few days after Miss Richardson was bought out Mr. Gramling told Lorene Gray that he would have to make her a present of one share of stock to make the third party "and I was in the office and filled it out and signed it as president."

The certificate of stock originally issued to the plaintiff, with the following indorsements thereon was offered in evidence: "For value received, I hereby sell, assign and transfer unto Gladys L. Gramling, thirteen within shares of the capital stock represented by the within certificate, and do hereby irrevocably constitute and appoint C. H. Gramling to

transfer the said stock on the books of the within named corporation with full power of substitution in the premises. Dated Nov. 17th, 1927," signed by the plaintiff and witness.

While plaintiff's testimony on cross-examination is to the effect that she sold, and C. H. Gramling purchased, this stock, on her redirect examination she repudiated the testimony and gave testimony to the effect that she refused to sell to C. H. Gramling, and that he agreed to procure a purchaser for the stock. This in connection with the form of the transaction—the fact that the defendant gave her note for the purchase price, that she pledged the stock as collateral for its payment, as stipulated in the face of the note, the transfer of the stock to her, and the subsequent transfer by her of a part of the stock to another—was sufficient to carry the case to the jury on the question of whether the debt was that of the wife or of the husband, and this is so notwithstanding defendant's denial of the purchase. Jones et al. v. Bell, 201 Ala. 336, 77 So. 998; Lay v. Fuller et al., 178 Ala. 375, 59 So. 609; Norton v. Birmingham Fertilizer Co., 15 Ala. App. 553, 74 So. 97; Sample v. Guyer, 143 Ala. 613, 42 So. 106; Myers v. Steenberg, 206 Ala. 457, 90 So. 302.

The appellee's contention that the alleged agreement made by C. H. Gramling, for "the Company," to refund or return to the plaintiff the money paid for the capital stock issued to her in the formation of a corporation, implied an obligation on the part of the husband, and the execution of the note in satisfaction of this obligation was nudum pactum, unless that obligation was surrendered or canceled. One fault of this contention is that it assumes that the evidence shows that Gramling, individually, agreed to repurchase the stock or refund the money, and that this obligation was the sole and only consideration of the note. Another is that the alleged agreement itself, if made by Gramling as an individual, was nudum pactum. Richter v. Richter, 180 Ala. 218, 60 So. 880; Richardson Bros. & Co. v. Fields, 124 Ala. 536, 26 So. 981.

The further contention that the undisputed evidence shows that the stock transferred to Mrs. Gramling was worthless at the time of the execution of the note is not sustained by the record. True, the evidence shows that the corporation was insolvent, but this is not conclusive of the fact that the stock was without market value—was worthless.

The court, therefore, erred in giving the affirmative charge for the defendant. The other assignments of error are without merit.

Reversed and remanded.

SAYRE, THOMAS, and FOSTER, JJ., concur.